1  STEVEN T. GUBNER - Bar No. 156593
   RICHARD D. BURSTEIN - Bar No. 56661
2  REAGAN E. BOYCE - Bar No. 248064
   EZRA BRUTZKUS GUBNER LLP
3  21650 Oxnard Street, Suite 500
   Woodland Hills, CA 91367
4  Telephone:  (818) 827-9000
   Facsimile:  (818) 827-9099
5  Email:      sgubner@ebg-law.com
               rburstein@ebg-law.com
6              rboyce@ebg-law.com

7  Attorneys for Peter S. Kravitz, Chapter 11 Trustee

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| In re | Case No. 12-32747 HLB |
|---|---|
| THE ZUERCHER TRUST OF 1999, | Chapter 11 |
| Debtor. | **CHAPTER 11 TRUSTEE'S MOTION TO VACATE PRIOR ORDER "GRANTING MOTION AND SETTING BID PROCEDURES," [DOCKET #320] AND FOR ENTRY OF NEW ORDER (1) APPROVING NEW STALKING HORSE BIDDER; (2) APPROVING AMENDED SALE PROCEDURE AND BID PROTECTIONS IN CONNECTION WITH SALE OF CERTAIN REAL PROPERTY LOCATED AT 2400-2424 BAYSHORE BLVD., SAN FRANCISCO, CA 94134 FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES; AND (3) SCHEDULING AN AUCTION FOR SALE AND HEARING TO APPROVE THE SALE; DECLARATIONS OF PETER S. KRAVITZ AND REAGAN E. BOYCE** |
| | **Hearing Scheduled:**<br>**Date:  January 30, 2014**<br>**Time:  10:00 a.m.**<br>**Place:** Courtroom 23<br>235 Pine Street, 23rd Floor<br>San Francisco, CA 94104<br>**Judge:** Hon. Hannah L. Blumenstiel |

891950

# **TABLE OF CONTENTS**

Page

I.      INTRODUCTION ................................................................................................. 2

II.     PROCEDURAL BACKGROUND AND RELEVANT FACTS ............................. 3

III.    WHY NEW STALKING HORSE BID TERMS ARE NECESSARY .................. 4

IV.     THE PROPOSED SALE ...................................................................................... 5

V.      A SUMMARY OF THE KEY TERMS OF THE PROPOSED SALE TO THE
        STALKING HORSE BIDDER ............................................................................ 7

VI.     THE SALE PROCEDURES ................................................................................ 8

        A.      Bayshore Property To Be Sold Free And Clear ...................................... 8

        B.      Notice of the Bid Procedure .................................................................... 8

        C.      Submission of Offer ................................................................................ 9

                a.      Deposit ........................................................................................ 9

                b.      Proof of Good Funds ................................................................ 10

                c.      Minimum Overbid Amounts ..................................................... 10

                d.      No Right of Objection to Other Potential Bidders .................... 10

        D.      The Auction and Selection of the Successful Bid .................................. 11

        E.      Return of Deposit .................................................................................. 11

        F.      Closing .................................................................................................. 11

VII.    CONCLUSION. ................................................................................................ 12

DECLARATION OF PETER S. KRAVITZ ................................................................... 13

DECLARATION OF REAGAN E. BOYCE .................................................................. 16

i

# **TABLE OF AUTHORITIES**

Page

**STATUTES**

Federal Rules of Bankruptcy Procedure, Rule 2002 ............................................................. 1, 8

Federal Rules of Bankruptcy Procedure, Rule 6004 ............................................................... 1

Federal Rules of Bankruptcy Procedure, Rule 6004(f)(1) ...................................................... 8

Federal Rules of Bankruptcy Procedure, Rule 6006 ............................................................... 1

Federal Rules of Bankruptcy Procedure, Rule 9014 ............................................................... 1

11 U.S.C. §101 ........................................................................................................................ 1

11 U.S.C. §105 ........................................................................................................................ 1

11 U.S.C. §363 ........................................................................................................................ 1

11 U.S.C. §363(h) .................................................................................................................. 13

ii

891950

Peter S. Kravitz, the duly appointed, qualified and acting Chapter 11 Trustee, ("***Trustee***") in the above captioned bankruptcy case, ("***Case***") of debtor, The Zuercher Trust of 1999, ("***Debtor***"), hereby moves, (the "***Amended Bid Procedure Motion***") this Court to Vacate Its Order "Granting Motion and Setting Bid Procedures," [Docket #320] and for entry of an order pursuant to sections 105 and 363 of 11 U.S.C. §101, *et. seq.*, (the "***Bankruptcy Code***") and *Federal Rules of Bankruptcy Procedure*, Rules 2002, 6004, 6006 and 9014 (each a "***Bankruptcy Rule***" and collectively the "***Bankruptcy Rules***"):

1) vacating the Court's Prior Order approving Bid Procedures [Docket #320];

2) approving the new Stalking Horse Bidder;

3) approving the amended sale procedures and bid protections in connection with the sale of certain real property located at 2400-2424 Bayshore Blvd., San Francisco, CA 94134, ("***Bayshore Property***") free and clear of all liens, claims, interests, and encumbrances; and

4) scheduling an auction for sale, ("***Auction***") and the date of hearing, ("***Sale Hearing***") to consider the motion for approval of the sale, ("***Sale Motion***").

This Amended Bid Procedure Motion is based on the Declarations of Peter S. Kravitz, ("***Kravitz Decl.***") and counsel Reagan E. Boyce ("***Boyce Decl.***").

The legal points and authorities supporting the Sale Motion will be included in the papers filed in conjunction with the Sale Motion. This Amended Bid Procedure Motion merely seeks to vacate the prior order and to approve new Stalking Horse Bidder terms and the Court's approval of the amended bidding procedures which are to be conveyed to interested parties by formal notice in advance of the Sale Hearing. Accordingly, the Trustee is not filing a separate memorandum of points and authorities for this Bid Procedure Motion.

The rationale for granting this Bid Procedure Motion is clear: it is in the Debtor estate's interest to maximize the value for any asset it sells, and an auction among qualified bidders is the most likely means to determine the actual market value of the Bayshore Property. The Court previously approved bidding procedures in relation to the previously approved Bid Procedure Motion. The Stalking Horse bid set forth therein has been withdrawn by the bidder. Instituting the amended bid procedures set forth in this Amended Bid Procedure Motion can only increase the

1

benefit to the Estate by ensuring an opportunity for interested bidders to submit bids prior to and at an auction.

In the Sale Motion, the Trustee will seek Court authorization to sell the Bayshore Property free and clear of all liens, claims, interests and encumbrances to RTC-Equity LLC, a California limited liability company and any designee(s), (the "***Stalking Horse Bidder***").

## I.   INTRODUCTION

The Debtor is the 88.5% owner of the Bayshore Property. The remaining 11.5 % is owned by Sterling Heatley, ("***Heatley***") who has agreed and stipulated to the sale of his ownership interest with the sale of the Bayshore Property in order to maximize the price obtained for the Bayshore Property and both owners.[*see Docket #274*]. As previously set forth in the Trustee's declaration in support of the prior Motion seeking approval of a stalking horse bidder and overbid procedures, the Bayshore Property is currently generating barely enough income to cover its mortgage payment and basic day to day operating expenses. [*see Docket #276* ¶6-7]. While the current rents have increased slightly from the $10,000 range to approximately $15,000 per month, the funds generated by the building will not cover necessary repairs, remodeling necessary to make the units fit for occupancy and legal fees and costs for unlawful detainers, or other potential expenses that are reasonably likely to be necessary in the immediate future. (Kravitz Decl. ¶4-5; Boyce Decl. ¶4-5.)

On October 25, 2013, the Trustee filed his application to employ real estate brokers Madison Partners in connection with ARA Pacific, ("***Application to Employ***"). [Docket #340]. Despite his prior stipulation consenting to the sale of the Bayshore Property, and his frequent demands to the Trustee to "hurry up and list" the Bayshore Property since the Court approved the prior Bid Procedure Motion, Heatley filed an objection to the Trustee's Application to Employ, causing further delays in the commencement of marketing efforts to list and sell the Bayshore Property. At the hearing on the Trustee's Application to Employ, held on December 5, 2013, the Court overruled these objections, and granted the application with one modification. An order was entered by the Court on December 13, 2013. [Docket #389].

///

///

2

The Trustee was unable to submit the Application to Employ in accord with the Court's Order approving the prior motion to approve bid procedures because of the rejection of the bid by the bidder. Without the previously approved Stalking Horse Bidder, the terms upon which the Bayshore Property was to be marketed for sale were unclear. In preparation for marketing the Bayshore Property, the Trustee's counsel asked the [then] proposed brokers to evaluate the Bayshore Property as to a possible range of selling price, and to note any features regarding the property that would influence a potential purchase price of the property. (Boyce Decl. ¶6.) As part of the evaluation performed by the Trustee's brokers it became clear that the Bayshore Property has several areas that require renovation. (Boyce Decl. ¶6.) Although the Trustee does not intend to make these renovations prior to sale, the need for remodeling and rehabilitation work does affect the potential price for the Bayshore Property, including limiting the ability to rent vacant spaces during the interim. (Boyce Decl. ¶6.) The need for renovation and repair means that several units of the building will have to remain vacant until the building is sold. (Boyce Decl. ¶6.)

In addition to the unit condition issues, the common areas of the building also present several issues that will eventually require further expenditure. (Boyce Decl. ¶6.) For example, the Trustee recently had to have the entire roof repaired in preparation for the upcoming rainy season. (Boyce Decl. ¶5.) It is anticipated that other common areas or portions of the occupied units may also require further repairs for normal wear and tear before the property can be sold. Given the previously ordered extended marketing period and the anticipated further extension of marketing time necessitated by the Debtor's objections to the Trustee's efforts, these repairs may fall to the Trustee to effectuate before a sale is finalized. (Boyce Decl. ¶5.)

The current tenants also present a potential drain on Estate assets. Two of the units occupied at the time of purchase in June 2012 by the Debtor and Heatley were in default under their rent payment obligations. (Boyce Decl. ¶7.) During the eight months that Debtor and Heatley retained possession of the Bayshore Property following purchase, these tenants remained in default - neither the Debtor nor Heatley undertook to collect the past due rents or have the defaulting tenants evicted. (Boyce Decl. ¶7.) The Trustee has not been able to collect rent from these problem tenants since the

Case: 12-32747    Doc# 411    Filed: 12/30/13    Entered: 12/30/13 18:08:22    Page 6 of
40

Trustee took over the administration of the Estate in February 2013. (Boyce Decl. ¶7.) The other tenants of the building are now raising complaints about these problem tenants which indicate an eviction proceeding is necessary. (Boyce Decl. ¶7.) In order to have these problem tenants removed, the Trustee will have to prosecute unlawful detainer actions. (Boyce Decl. ¶7.) This is an additional expense which will become necessary sooner rather than later. The Trustee recently hired a property manager to assist him with the management of the Bayshore Property.

In light of the expected need to spend additional Estate assets just to maintain the Bayshore Property, let alone make it more marketable to potential purchasers, the Trustee previously deemed this asset to be more beneficial to the Estate if sold and the equity used to pay the Estate's creditors. [Docket #276] (Kravitz Declaration ¶6-7.) In the interim the Trustee has decided to retain a property manager to manage the Bayshore Property on a full time basis and has just hired a highly recommended firm – Jackson Group Property Management. (Boyce Decl. ¶5-7.) The previous on-going disruptions and interference caused by the Debtor's principal, Monica Hujazi ("*Hujazi*") which was the subject of a motion for contempt filed by the Trustee and granted by the Court on December 20, 2013 [Docket #346], the problems being caused by the two "trouble tenants," and other maintenance issues have made a property manager necessary. (Kravitz Decl. ¶3; Boyce Decl. ¶8.)

The Trustee filed his Application to Employ Brokers and Heatley filed a formal objection to both the broker selected and the proposed listing price set by the Trustee. As set forth in the Trustee's Reply to Heatley's Opposition, the listing price proposed by Heatley was unreasonably high and outside fair market value for the Bayshore Property in its current condition. [Docket # 359]. The Trustee replied to this opposition; setting forth the reasoning for his selection of the brokers and the reason for the suggested listing price. [Docket #359]. The Court granted approval of the Trustee's application to employ brokers and the proposed listing price at the December 5, 2013 hearing. [Docket #389].

## III.    WHY NEW STALKING HORSE BID TERMS ARE NECESSARY

At the time the Trustee filed his prior Motion seeking a Court Order approving the original stalking horse bidder and sale procedures [Docket #270], the original stalking horse bidder was still

4

891950

1 conducting its due diligence into the property. (Boyce Decl. ¶9.) This extended due diligence period

2 was necessary, mostly due to the inability of the Trustee to obtain documents from the Debtor

3 regarding the Bayshore Property or obtain access to the property. (Boyce Decl. ¶9.) Once the

4 original stalking horse bidder completed its due diligence, it asserted that the Bayshore Property was

5 not worth the proposed $3.1 million purchase price and timely withdrew its offer on or about

6 September 15, 2013 - within the timeframe permitted under the original purchase agreement. (Boyce

7 Decl. ¶9.) This withdrawal of the original stalking horse bidder occurred three days after the Court

8 entered its Order approving the Trustee's Motion and the original stalking horse bidder. (Boyce

9 Decl. ¶9.) [Docket #320].

10       Because the Court's Order provided the Trustee time to file an application for broker, the

11 Trustee simultaneously sought out a new stalking horse bidder and began searching for a potential

12 broker. (Boyce Decl. ¶9.) As the timing worked out the Trustee received several new letters of intent

13 from potential stalking horse bidders, including the original stalking horse bidder who came back

14 with an amended proposed purchase price at the same time the Trustee's broker was found. (Boyce

15 Decl. ¶9.) Thus the Trustee had to negotiate the material new stalking horse bidder terms of purchase

16 before a proposed broker agreement could be submitted to the Court. (Boyce Decl. ¶9.) On October

17 25, 2013 the Trustee filed his application to employ broker which included the terms of the listing

18 agreement. (Boyce Decl. ¶9.) Although the new proposed purchase price is less than the original

19 proposed stalking horse bidder price, the Trustee feels confident that his brokers will bring in

20 multiple overbids to drive the purchase price up to its highest and best potential. (Boyce Decl. ¶9.)

21 The selected listing price was carefully determined with just that purpose in mind – to solicit the

22 widest spectrum of potential purchasers who will make an overbid on the Bayshore Property at

23 auction. (Boyce Decl. ¶9-10.) The Stalking Horse Bidder has also now confirmed his agreement to

24 the purchase as the inspection period has concluded, and no further objections to the sale have been

25 made by the Stalking Horse Bidder. . (Boyce Decl. ¶10.)

26 **IV.**     **THE PROPOSED SALE**

27       The Trustee has reviewed all the documents produced by the Debtor's principal and Heatley

28 to date, as well as conducting a physical inspection of the Bayshore Property. The Trustee has also

891950

Case: 12-32747    Doc# 411    Filed: 12/30/13    Entered: 12/30/13 18:08:22    Page 8 of 40

consulted with his counsel and his brokers and experts. The Trustee's brokers have reviewed the due diligence documents produced by the Debtor, have physically inspected the property and consulted their own experts regarding the Bayshore Property. The property is currently subject to a monthly mortgage payment in the amount of $10,281.00. This obligation is secured by a first priority deed of trust. (Boyce Decl. ¶11.) The property had been subject to several other liens from the City and County of San Francisco. The Trustee has now cleared all known liens against the property except for the mortgage. (Boyce Decl. ¶11.)

As previously stated, the Trustee believes the property to be worth at least $3.25 million "as-is." The Trustee, after soliciting a second round of stalking horse bidders, has entered into a new agreement with the Stalking Horse Bidder who has agreed to purchase the Bayshore Property for $2,750,000, has agreed to pay all closing costs, escrow fees, transfer taxes, and its broker fees as well as any environmental clean-up costs associated with the transfer of the property. (Boyce Decl. ¶10.) In addition, the Stalking Horse Bidder has agreed to waive a credit for tenant security deposits or pre-paid rents collected before the Trustee took over administration of the property. (Boyce Decl. ¶10.) These concessions were material to the Trustee's decision to accept the current bid.

Based on the above investigation, the Trustee has determined that as to the Bayshore Property in its present condition, that there is no more than a potential couple thousand dollars in monthly revenue net available for the Estate. In the event that a large capital improvement or repair becomes necessary, the current rent rolls will not cover such expenses. The Trustee has further determined that selling the Bayshore Property to the Stalking Horse Bidder or Court Approved Overbidder, will benefit the Estate by reducing the drain on the Estate's limited resources while simultaneously resulting in a much needed influx of cashflow to the Estate. The Bayshore Property is currently the only asset of the Estate not tied up in other litigation and therefore the best opportunity to realize income for the Estate and its creditors. Numerous other assets of the Debtor are the subject of an adversary proceeding seeking to avoid and recover fraudulent transfers by the Debtor. (*Kravitz v. Peninsula Commons, LLC, et al,* United States Bankruptcy Court for the Northern District of California, proceeding number 13-03046.)

///

891950
Case: 12-32747     Doc# 411     Filed: 12/30/13     Entered: 12/30/13 18:08:22     Page 9 of 40

## V.    A SUMMARY OF THE KEY TERMS OF THE PROPOSED SALE TO THE STALKING HORSE BIDDER

a.    Sale of the Bayshore Property to the Stalking Horse Bidder for the purchase price of $2,750,000 free and clear of all liens, claims, interests and encumbrances;

b.    Buyer to pay all closing costs, expenses, escrow fees, transfer taxes, and his broker fees (pursuant to the terms of the proposed Purchase Agreement). Buyer also will waive the usual and customary credit for tenant security deposits or pre-paid rents collected prior to the Trustee's takeover of administration of the Bayshore Property;

c.    Prior to the Sale Hearing on the Sale Motion, the Stalking Horse Bidder will tender a deposit of $50,000.00 to an Escrow account to be held in trust, via certified funds, and to be credited towards the purchase of the Bayshore Property. If the Sale Motion is not approved, or if a party other than the Stalking Horse Bidder is determined to be the successful bidder of the Bayshore Property, then the Trustee shall refund the $50,000.00 to the Stalking Horse Bidder, by and through its counsel. In the event the stalking Horse Bidder fails to close escrow, the Deposit will become forfeit as liquidated damages under the Purchase Agreement;

d.    If a party other than the Stalking Horse Bidder is determined to be the successful bidder, then the sum of $50,000.00 ("***Break-up Fee***") from the Overbid Amount will be paid to the Stalking Horse Bidder by the Trustee to cover the Stalking Horse Bidder's actual costs and expenses, subject to Court approval;

e.    In addition to the regular notice requirements, notice of the Sale Hearing is to be posted on each unit at the Bayshore Property and will be published in at least two appropriate periodicals in San Francisco County;

f.    The Trustee has undertaken listings of the property by Madison Partners and ARA Pacific who have been approved by the Court for employment as brokers for the Bayshore Property. Both brokers have sources for marketing venues through which the property will be advertised.

g.    The sale hearing and auction will occur no sooner than ninety days following the Court's Entry of an Order approving Sale and Bid Procedures.

///

7

891950

# VI.    THE SALE PROCEDURES

Pursuant to *Bankruptcy Rule* 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or by auction. The Trustee has obtained a stalking horse cash purchase bid for the Bayshore Property from the Stalking Horse Bidder and seeks authority to conduct the Auction at which the Stalking Horse Bidder's cash bid will be subject to higher and better offers. Because it appears to the Trustee that there is no positive net cashflow being generated by the Bayshore Property, there is no benefit to the Estate if the Trustee keeps the property, and ongoing maintenance and operation of the Bayshore Property exposes the Estate to future claims and liabilities.

The purchase agreement entered into with the Stalking Horse Bidder will bring funds into the estate and significantly decrease the potential for future claims and liabilities. Furthermore, the Auction that will be conducted at the same date and time as the Sale Hearing on the Sale Motion and in accordance with the Sale Procedures will enable the Trustee to obtain the "highest and best" offer for the Bayshore Property, thereby potentially maximizing the value of the Bayshore Property to the Estate. Those procedures provide as follows:

### A.    Bayshore Property To Be Sold Free And Clear.

The specifics of the sale of Bayshore Property will be set forth in the Sale Motion. The Bayshore Property shall be sold free and clear of all liens, claims, interests and encumbrances whatsoever.

### B.    Notice of the Bid Procedure.

The Trustee proposes to serve the Notice of the Court approved Bid Procedures, Auction and Sale Hearing within ten days after entry of the order on this Bid Procedure Motion, by first class mail or personal service, or electronic means where prior agreement exists, upon all creditors and parties in interest, all parties who have contacted the Trustee and indicated an interest in the Bayshore Property, all entities known to have asserted any interest in or upon the Bayshore Property, all tenants that reside at the Bayshore Property, and all entities required to be served by *Bankruptcy Rule* 2002.

///

8

891950

Any party in interest who wishes to receive a copy of this Motion and/or the Sale Motion shall make such request in writing to counsel for the Trustee, Ezra Brutzkus Gubner LLP, 21650 Oxnard Street, Suite 500, Woodland Hills, CA 91367, (818) 827-9000, Facsimile (818) 827-9099, Attention: Steven T. Gubner or via email to sgubner@ebg-law.com, or Richard D. Burstein at rburstein@ebg-law.com

### C.  Submission of Offer

Any person or entity ("***Potential Purchaser***") interested in submitting a bid on the Bayshore Property shall deliver an offer to Peter S. Kravitz, c/o Steven T. Gubner, Esq. or Richard D. Burstein, Esq. at Ezra Brutzkus Gubner LLP, 21650 Oxnard Street, Suite 500, Woodland Hills, CA 91367, (818) 827-9000, Facsimile (818) 827-9099, email: sgubner@ebg-law.com, or rburstein@ebg-law.com, so that such bid is <u>actually received</u> no later than 5:00 p.m. (prevailing Pacific Time) no later than five (5) business days before the scheduled sale, which sale is to be scheduled on the same date as the hearing on the Sale Motion (each such offer shall be referred to hereinafter as an ("***Offer***").) Counsel for the Trustee shall circulate copies of all Offers immediately to counsel for the Stalking Horse Bidder and such other parties as the Court may identify.

In order to submit an Offer and participate in the auction for the sale of the Bayshore Property, any Potential Purchaser must be deemed a "*Qualified Bidder*" as set forth below:

An Offer shall, at a minimum, provide that (1) the Potential Purchaser offers to purchase the Bayshore Property in its entirety, and is prepared to enter into and consummate the transaction upon the order approving the sale of the Bayshore Property; (2) such Offer is not subject to, conditioned on, and does not contain any material contingencies as to the validity, effectiveness, and/or nature of the Offer including, without limitation, contingencies for financing, due diligence, or inspection; and (3) the purchase price shall be paid in full, in cash or immediately available funds at closing.

#### a.  Deposit.

An Offer shall be accompanied by a cashier's check or otherwise confirmable method of transfer in the amount of twenty-five percent (25%) of the Offer (the "***Deposit***") which will be either (i) credited against the purchase price in the event the Court approves a sale of the Bayshore Property to such overbidder(s), or (ii) returned to such overbidder in the event

9

891950

that a different bidder(s) is the successful bidder(s). The Sale Motion may provide that any such deposit made by a Qualified Bidder who ultimately becomes the successful bidder ("*Successful Bidder*") shall be subject to a liquidated damages provision, should the sale of the Bayshore Property fail to close as the result of an act or omission or other malfeasance of the Successful Bidder. All Deposits will be held in a segregated account until after the Auction is completed.

**b.      Proof of Good Funds.**

An Offer must contain information, satisfactory to the Trustee in his sole discretion, which demonstrates that the Potential Purchaser has sufficient cash on hand or a binding financial commitment from an established, commercial, financial institution in good standing to ensure that such Potential Purchaser has the ability to close and will in fact close the transaction within the time frame established; such financial information includes, but is not limited to, certified financial statements from the Potential Purchaser.

**c.      Minimum Overbid Amounts.**

An Offer on the Bayshore Property must be a minimum initial overbid of $2,850,000.00 (which equals the Stalking Horse Bidder's offer plus $100,000.00). Each subsequent overbid must be in increments of $25,000.00. Only Potential Purchasers who meet the conditions set forth in this Section C shall be deemed qualified bidders ("*Qualified Bidders*") who are able to submit overbids at the auction.

**d.      No Right of Objection to Other Potential Bidders**

The Trustee in his sole discretion shall determine whether an Offer has satisfied all of the conditions set forth above. Neither the Stalking Horse Bidder, nor any Potential Bidder may object to the designation of another Potential Bidder, as a Qualified Bidder. Any Offer that satisfies such conditions set forth in subsection "c" shall be deemed a "**Qualified Bid.**" The Stalking Horse Bidder is deemed a Qualified Bidder and has submitted a Qualified Bid. If a Qualified Bid is received, the Stalking Horse Bidder shall have the right to submit subsequent overbid(s) to the Trustee at any time prior to the Auction/Sale Motion date set for the Bayshore Property.

10

891950

Case: 12-32747     Doc# 411     Filed: 12/30/13     Entered: 12/30/13 18:08:22     Page 13 of
40

### D. The Auction and Selection of the Successful Bid.

Unless otherwise ordered by the Court, the Auction will be conducted at the same time and date as the Sale Hearing, at a time and date to be disclosed in future notice, in courtroom 23 of the United States Bankruptcy Court for the Northern District of California, located at 235 Pine Street, 23rd Floor, San Francisco, CA California 94104, a minimum of ninety days after the Court enters an order approving the sale and bid procedures.

Only parties who have timely submitted a Qualified Bid and are determined to be Qualified Bidders will be permitted to participate in and/or make any statements on the record at the Auction, unless otherwise ordered by the Court. All Qualified Bidders must appear in person at the Auction, or through a representative with authorization to bind the Qualified Bidder to any bid made. If multiple Qualified Bids satisfying all Auction requirements are received by the deadline set forth in section C above, each party shall have the right to continue to improve its bid at Auction. The Auction will be an "open format" such that all participants are required to inform the Court at the podium of their subsequent bids. The Trustee reserves the right to cancel the Auction and to move forward with a private sale.

The Trustee may conduct the Auction in all respects in the manner that the Trustee determines will result in the highest, best or otherwise financially superior offer(s) for the Bayshore Property provided that such manner is not inconsistent with the provisions set forth herein or with the *Bankruptcy Code*.

### E. Return of Deposit.

As noted above, Deposits of all Qualified Bidders shall be held in a segregated account and retuned to any unsuccessful bidders within the third business day after the Auction has been completed.

### F. Closing.

The Sale Motion shall seek an order further authorizing the Trustee to execute any and all documents, assignments, consents or instruments on behalf of any third party, including the holders of any liens, claims or interests identified in the Sale Motion or in this Motion, and/or any and all documents which are reasonably necessary or appropriate to effectuate or consummate the sale of

Case: 12-32747     Doc# 411     Filed: 12/30/13     Entered: 12/30/13 18:08:22     Page 14 of 40

the Bayshore Property and transfer good and clean title to the Stalking Horse Bidder or the Successful Bidder(s) as required by a title insurance company.

## VII.    CONCLUSION

The Trustee believes that the Sale Procedures set forth above provide adequate notice for selling the Bayshore Property and will enable the Trustee to review, analyze and compare all bids received to determine which bids are in the best interest of the Debtor's Estate and its creditors. Moreover, the Trustee believes that the Sale Procedures are fair and reasonable under the circumstances. Therefore the Trustee respectfully requests that the Court approve the Sale Procedures and this Motion in its entirety.

DATED: December 30, 2013                         EZRA BRUTZKUS GUBNER LLP


By: _Reagan E. Boyce_
Steven T. Gubner
Richard D. Burstein
Reagan E. Boyce
Attorneys for, Peter S. Kravitz,
Chapter 11 Trustee

12

Case: 12-32747    Doc# 411    Filed: 12/30/13    Entered: 12/30/13 18:08:22    Page 15 of 40

## DECLARATION OF PETER S. KRAVITZ

I, Peter S. Kravitz, declare:

1.     I am the duly appointed, qualified and acting Chapter 11 Trustee, in the above captioned bankruptcy case of debtor, The Zuercher Trust of 1999, ("**Debtor**") and I am competent to make this declaration. I have personal knowledge of the facts set forth herein and if called as a witness I could and would competently testify. This declaration is made in support of my motion for *Order Vacating Prior Order "Granting Motion and Approving Bid Procedures," [Docket #320] and for Entry of New Order (1) Approving New Stalking Horse Bidder; (2) Approving Amended Sale Procedure and Bid Protections in Connection with Sale of Certain Real Property Located at 2400-2424 Bayshore Blvd., San Francisco, CA 94134 Free and Clear of All Liens, Claims, Interests and Encumbrances; and (3) Scheduling an Auction for Sale and Hearing to Approve the Sale,* ("**Motion**"). Any capitalized term used but not defined in this declaration shall have the same meaning as that ascribed in the Motion.

2.     Based on my understanding of the case, review of documents produced to date, and my investigation, the Debtor was at all times relevant hereto the 88.5% owner of the real property located at 2400-2424 Bayshore Blvd., San Francisco, CA 94104, (the "**Bayshore Property**"). Third party, Sterling Heatley, ("**Heatley**") is the owner of the remaining 11.5% interest. Mr. Heatley has entered into a stipulation which confirms his ownership interest and which sets forth his agreement to the sale of the Bayshore Property pursuant to section 363(h) of the *Bankruptcy Code*. [see Docket #274].

3.     In January 2013, this Court found that Debtor had grossly mismanaged the assets of the Estate post-petition and directed the U.S. Trustee to appoint a Chapter 11 Trustee in the case. The Order appointing me as the Chapter 11 Trustee was entered on January 31, 2013 and my acceptance of appointment was filed February 6, 2013. Since my involvement with this Case, the Debtor's principal, Monica Hujazi, ("**Hujazi**") has been uncooperative and has made many attempts to interfere with my attempts to manage the property of the Estate, including attempts to sell Bayshore Property and other real property held by the Debtor. I filed a motion seeking an order of contempt against Ms. Hujazi which was granted by the Court on December 20, 2013. I have also

13

sought and received a Court Order authorizing the taking of a Rule 2004 exam of Monica Hujazi, as well as several other third parties who are believed to have information and documents germane to my investigation and the assets/liabilities of the Debtor. The Court also issued an order at the December 20, 2013 hearing enjoining Hujazi and anyone acting on her behalf from entering the property of the Estate, including the Bayshore Property, interacting with the tenants, representing herself as the "owner" or "property manager" for the Bayshore Property, executing leases, collecting rents, or otherwise interfering with my administration of the Estate property.

4.      Based on my review of the Debtor's schedules, the files and pleadings in the above referenced case, and the financial documents provided by Debtor and third parties to date, as well as my own physical inspection of the Bayshore Property, I believe the value of the Bayshore Property to be approximately $3.25 million. I have solicited the opinion of my brokers ARA Pacific who have provided me their own independent analysis of the Bayshore Property and have suggested a list price of $3,425,000. In determining the potential sale price for the Bayshore Property I also considered the state of the property, the current rent rolls, the outstanding liens and encumbrances on the property, the condition of the property, geographic location, and the Debtor's own estimation of value when reaching my opinion as to the property's value.

5.      The current monthly mortgage payments owed on the property are approximately $10,281.00. The current monthly rent roll is $15,810.00. While the current rent provides a very small potential net gain most months, other operating costs and expenses, including property taxes ($7,309.00 paid for first half of 2013), repair costs, ($10,658.00 for roof repair and other maintenance), let alone emergency expenses more than exceed what small net gain the rent roll generates. The un-rented portions of the Bayshore Property would require additional expenses for maintenance and renovation before the spaces could be leased so there is no immediate opportunity to increase the rent roll without further depleting the Estate's assets.

6.      It is my business judgment that the terms for the proposed sale of the Bayshore Property, as set forth in the Motion for which this Declaration is offered in support, are in the best interest of the Estate. It appears clear that the rent rolls fail to meet the monthly operating costs, including the current mortgage payments on the Bayshore Property plus periodic expenses. It is

14

891950

therefore in the Estate's best interest to sell the Bayshore Property to the proposed Stalking Horse Bidder or another successful bidder at auction in order to generate positive net cashflow for the Estate, which funds will not be available if the Estate maintained ownership of the Property. To the best of my knowledge, all other assets of the Debtor are tied up in litigation and not readily available for liquidation, reorganization purposes, or otherwise.

7.     I propose the Sale Procedures set forth in the Motion in order to facilitate an open bid auction of the Bayshore Property, and to obtain the best possible offer the market will provide. The minimum overbids set forth in the Motion are necessary to ensure that the Estate will recover a positive net cashflow from the sale of the Bayshore Property. The Court has previously set forth a minimum ninety day marketing period to ensure sufficient time to market the Bayshore Property. The ninety day marketing period commenced upon entry of the Court's Order approving my brokers. However, in order to fully market the Bayshore Property and provide the fullest disclosure of information possible, the marketing efforts of my brokers will be hampered until the terms of overbid are approved by the Court. Based on the Court's timeline, an auction date could be set for early to mid-April 2014.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 30 day of December 2013, in Agoura Hills, California.

_____
Peter S. Kravitz

15

## DECLARATION OF REAGAN E. BOYCE

I, Reagan E. Boyce, declare:

1.     I am an attorney in good standing, duly admitted to practice before this Court. I am an attorney with the law firm EZRA BRUTZKUS GUBNER LLP, counsel to Peter S. Kravitz, the duly appointed, qualified, and acting Chapter 11 trustee, ("**Trustee**"), in the above captioned bankruptcy case, for the estate of debtor, The Zuercher Trust of 1999, ("**Debtor**"). This declaration is made in support of the Trustee's *Motion to Vacate Prior Order "Granting Motion and Setting Bid Procedures," [Docket #320] and for Entry of New Order (1) Approving New Stalking Horse Bidder; (2) Approving Amended Sale Procedure and Bid Protections in Connection with Sale of Certain Real Property Located at 2400-2424 Bayshore Blvd., San Francisco, CA 94134 Free and Clear of All Liens, Claims, Interests and Encumbrances; and (3) Scheduling an Auction for Sale and Hearing to Approve the Sale.*

2.     I have personal knowledge of the facts set forth herein. If called as a witness, I could and would competently testify to the following. Any capitalized terms not herein defined shall have the same meaning ascribed to them in the Motion.

3.     Attached hereto as Exhibit "A" is a true and correct copy of the Purchase Agreement executed by the Trustee and RTC Equity, LLC, (the "**Stalking Horse Bidder**").

4.     I have reviewed the monthly operating reports filed by the Trustee each month and am aware of the amounts collected in rent from tenants of the Bayshore Property and the amounts expended in relation to maintenance thereof, including utility bills, property taxes, and repairs and maintenance. I have had multiple discussions with the Trustee and his employees regarding the costs incurred each month to maintain the Bayshore Property. In addition, Sterling Heatley has communicated with me regarding additional maintenance and repairs that he believes need to be performed to the commercial areas of the Bayshore Property. The costs incurred to maintain the Bayshore Property exceed the monthly rents currently being collected. In addition, pending and anticipated expenses will further increase the deficit between the rents collected and the costs paid out. For example, in November 2013, the Trustee had to pay the property taxes on the Bayshore Property. In October, the roof required major repairs to prevent leaking into the residential units.

16

891950

And most recently, one of the tenants advised that they have a broken window requiring repair and a leaking skylight. These regular and routine costs deplete the small margin between rents and operating costs into a deficit.

5.  It has also been brought to my attention that the tenants in the residential units have made complaints regarding certain other tenants who are currently in default on their rents. This will require eviction proceedings which in turn will require further expenditure of estate assets. However, the Trustee has determined in his business judgment that the expense is necessary in order to preserve the value of the Bayshore Property for potential purchasers.

6.  I asked the Trustee's brokers to evaluate the Bayshore Property as to a possible listing price, and to note any features regarding the property that would influence a potential purchase price of the property. As part of the evaluation performed by the Trustee's brokers it became clear that the Bayshore Property has several areas that require renovation. Although the Trustee has indicated that he does not intend to make these renovations prior to sale, the need for remodeling and rehabilitation work does affect the potential price the Trustee will be able to obtain for the Bayshore Property, including limiting the ability to rent vacant spaces during the marketing period. The need for renovation and repair means that several units of the building will have to remain vacant until the building is sold.

7.  Two of the units occupied at the time of purchase by the Debtor and Heatley in June 2012 were in default under their rent payment obligations. During the eight months that Debtor and Heatley retained possession of the Bayshore Property following purchase, these tenants remained in default - neither the Debtor nor Heatley undertook to collect the past due rents or have the defaulting tenants evicted. The Trustee has not been able to collect rent from these problem tenants since the Trustee took over the administration of the Estate in February 2013. As previously mentioned, the other tenants of the building are now raising complaints about these problem tenants which indicate an eviction proceeding is necessary.

8.  The Trustee recently decided to retain a property manager to manage the Bayshore Property on a full time basis and asked his counsel to assist in hiring someone to perform this necessary service. The Trustee wanted a property manager to oversee the on-going maintenance of

17

891950

the Bayshore Property as well as handle unlawful detainer actions against at least two different tenants who have defaulted on their leases. The costs necessary to have a dedicated property manager to handle these matters has been determined as a necessary expense in the judgment of the Trustee. It is my understanding that the on-going disruptions and interference caused by the Debtor's principal, Monica Hujazi ("*Hujazi*") which was the subject of a motion for contempt filed by the Trustee and granted by the Court on December 20, 2013 [Docket #346], the problems being caused by the two "trouble tenants," and other issues that continue to arise have made a property manager necessary. The Trustee has also advised that he needs a reliable person to be available to open the property to the Trustee's brokers or other third party potential purchasers, a task not within the scope of the Trustee's brokers, so a property manager was hired.

9. The previously filed Motion to Approve Bid Procedures was filed before the proposed stalking horse bidder had completed its due diligence inspections. Unfortunately, the stalking horse bidder believed unacceptable conditions existed at the Bayshore Property given the proposed purchase price and withdrew its offer just three days after the Court's order approving the stalking horse bidder and purchase price was entered. Upon withdrawal of the stalking horse bidder and offer to buy, the Trustee then began a new round of solicitation to find a stalking horse bidder as well as seeking a broker to market the property in compliance with the Court order for a ninety day minimum marketing period. Because the search for a new stalking horse bidder and negotiations with brokers took longer than the thirty day period anticipated by the Court for the Trustee to file a formal application to employ brokers, I was not able to file the Trustee's application until October 25, 2013. As of that date, the Trustee was still in negotiations with the new Stalking Horse Bidder, specifically, completing a due diligence period.

10. The proposed new Stalking Horse Bidder has completed the contractual due diligence inspection period and has agreed to the condition of the property at the agreed upon purchase price. The Purchase Agreement was executed on December 9, 2013 and the inspection period concluded on December 27, 2013. The Trustee has executed a new agreement with the Stalking Horse Bidder who has agreed to purchase the Bayshore Property for $2,750,000. In addition the buyer has agreed to pay all closing costs, escrow fees, transfer taxes, and its broker fees as well as any environmental

18

clean-up costs associated with the transfer of the property. In addition, the Stalking Horse Bidder has agreed to waive a credit for tenant security deposits or pre-paid rents collected before the Trustee took over administration of the property. These additional concessions were material to the Trustee's ultimate decision to agree to the lower purchase price.

11.     The Bayshore Property is currently subject to a monthly mortgage payment in the amount of $10,281.00. This obligation is secured by a first priority deed of trust. The Trustee has informed me that all other outstanding liens have been cleared from the property as of October 2013, other than future tax obligations.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 30th day of December 2013 in Woodland Agoura Hills, California.

_____
Reagan E. Boyce

Case: 12-32747     Doc# 411     Filed: 12/30/13     Entered: 12/30/13 18:08:22     Page 22 of 40

## PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** ( "**Agreement**") is entered into as of December 9, 2013, (the "**Effective Date**"), by and between PETER S. KRAVITZ ("**Trustee**"), in his capacity as Chapter 11 Trustee for the estate ("**Estate**") of The Zuercher Trust of 1999 ("**Debtor**" or "**Zuercher**"), the debtor in case no. 12-bk-32747-HLB (the "**Bankruptcy Case**") pending in the United States Bankruptcy Court, Northern District of California (the "**Bankruptcy Court**" or "**Court**") (and collectively hereinafter, "**Seller**"), and RTC-Equity LLC, a California limited liability company, or its assignee (collectively "**Buyer**"), (each of which are hereafter referred to jointly as the "**Parties**" and each individually a "**Party**") with reference to the following facts:

### RECITALS

**A.** By virtue of the Bankruptcy Case and operation of the United States Bankruptcy Code, 11 U.S.C. §101 et seq., the Estate holds title to that certain real property located at 2400-2424 Bayshore Blvd, San Francisco, California (the "**Bayshore Property**").

**B.** Trustee is the duly appointed and acting Chapter 11 trustee for the Estate of Zuercher, holding title pursuant to 11 U.S.C. §521.

**C.** Buyer desires to purchase the Bayshore Property, and Seller desires to sell the Bayshore Property under the terms set forth below.

**D.** The proposed sale of the Bayshore Property by Seller to Buyer and the terms of this Agreement are subject to Court approval.

**E.** This Agreement amends and replaces the Purchase and Sale Agreement dated as of July 17, 2013, entered into between Buyer and Seller.

**NOW, THEREFORE, IN RELIANCE** upon the foregoing Recitals and in consideration of the mutual covenants set forth herein and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Seller and Buyer agree as follows:

### ARTICLE I
### TERMS OF AGREEMENT

**1.1.** <u>Agreement of Sale</u>. Seller agrees to sell and convey the Bayshore Property to Buyer, and Buyer agrees to purchase the Bayshore Property from Seller by grant deed in the form of <u>Exhibit 1</u> attached hereto (the "**Grant Deed**"), subject to and in strict accordance with the terms and conditions set forth in this Agreement and upon Court approval.

1

Case: 12-32747    Doc# 411    Filed: 12/30/13    Entered: 12/30/13 18:08:22    Page 23 of 40

**1.2.** **Closing Date.** The closing (the "**Closing**") shall occur, unless this Agreement is terminated in accordance with the provisions hereof, upon the date the Grant Deed is recorded in the Office of the County Recorder of San Francisco County (the "**Closing Date**"). The Closing Date shall occur thirty (30) days after the entry of a final Approval Order (as defined below). For purposes of this Agreement, "**Approval Order**" shall mean an order of the Court, or other court of competent jurisdiction, confirming the Sale after the Overbid Auction (defined in Section 8.3 below) which (1) approves Buyer as the final purchaser of the Bayshore Property; (2) confirms the terms of the Sale, and (3) that is final for purposes of appeal, as to which the time for appeal, including any extensions, has expired, and from which no appeal has been taken. Notwithstanding the foregoing sentence, nothing shall prevent the sale from Closing if an appeal of the Approval Order is filed but no stay pending appeal is issued by a court of competent jurisdiction.

## ARTICLE II
## PURCHASE PRICE

**2.1.** **Purchase Price.** The purchase price for Bayshore Property (the "**Purchase Price**") shall be Two Million Seven Hundred Fifty Thousand Dollars ($2,750,000), which shall be payable in good and immediate federal funds, subject to bidding procedures as set forth in Sections 8.2 and 8.3 and subject to only those prorations outlined in Section 6.4.

**2.2.** **Payment of Purchase Price.** Within three (3) business days after the execution of this Agreement Buyer shall deliver to Escrow (as hereinafter defined) the sum of Fifty Thousand Dollars ($50,000) as an earnest money deposit (the "**Deposit**"). Escrow shall hold the Deposit in trust pending Closing. In the event that the Closing does not occur on or before the **Outside Closing Date,** (as defined below), either Party may terminate this Agreement and Escrow will return the Deposit to Buyer within three (3) business days after receipt of written notice of such termination. The Deposit shall be delivered to and held by Escrow pursuant to the terms, covenants and conditions of this Agreement; provided that if the close of Escrow occurs as contemplated by this Agreement, the Deposit shall be applied against the Purchase Price and shall be subject to and held in accordance with the Liquidated Damages provision of this Agreement. The balance of the Purchase Price shall be paid by Buyer to escrow holder by wire transfer at least one (1) business day prior to the Closing Date.

**2.3.** **Escrow.** Lawyer's Title Company (the "**Title Company**") shall act as escrow holder for the transactions contemplated by this Agreement ("**Escrow**"). Any escrow instructions which shall be executed by the Parties hereto shall implement the performance of this Agreement and shall be deemed to incorporate the provisions hereof, whether or not specifically stated therein. Buyer and Seller shall jointly execute and deposit any other documents necessary to facilitate the close of Escrow.

**2.4.** **Outside Closing Date.** Seller shall seek a modification of that certain Order Granting Motion and Settling Bid Procedures (the "**Sales Procedure Order**") entered by the Court on September 12, 2013, and setting the month of February 2014 as the estimated time for the auction and hearing of a motion to approve Buyer's purchase of the Property.

2

The modification will provide notice to all interested parties of the terms of sale provided for in this Agreement. In the event that the Court modifies the Sales Procedure Order to extend the time period within which the Overbid Auction and Hearing to Approve Sale Motion are to take place this Agreement will remain in full force and effect until the earlier of either (1) the Overbid Auction and Hearing to Approve Sale Motion takes place, or (2) nine months from the Effective Date of this Agreement (the "**Outside Closing Date**"), at which time the Buyer or Seller can choose to extend or to cancel this Agreement.

**ARTICLE III**
**REPRESENTATIONS, WARRANTIES AND COVENANTS**

    **3.1.**   **Authorization of Seller.**  Trustee is the duly appointed, qualified, and acting Chapter 11 Trustee for the Estate. This Agreement has been duly executed and delivered by Seller, and upon entry of a final Approval Order, is a valid and binding obligation of Seller, enforceable against Seller in accordance with its terms (except to the extent that enforcement may be affected by applicable bankruptcy, reorganization, insolvency and/or similar laws affecting creditors' rights and remedies and by general principles of equity). In addition, the terms of the Sales Procedures Order contemplated by <u>Sections 8.2</u> hereof, or any other Orders of the Court regarding the Bayshore Property, shall be binding upon the parties upon entry thereof, and to the extent that such orders contradict any terms of this Agreement, such Orders shall supersede the terms of this Agreement; all other terms of this Agreement shall remain in full force and effect. In the event that the Court issues an Order(s) at the Auction and Hearing to approve Sale that materially alters the terms of this Agreement, Buyer must either 1) inform the Court that it is not in agreement with said terms and withdraws its offer to purchase under this Agreement before the Auction concludes, or 2) inform the Court on the record that Buyer is in agreement with any Order(s) that materially alters this Agreement.

    **3.2.**   **Title to Bayshore Property.**  Subject to <u>Section 8.2</u> below, Seller has (or will have as of the Closing pursuant to Sections 363(b), (f), and (h) of the Bankruptcy Code) good and marketable title to the Bayshore Property, and will convey the Bayshore Property free and clear of all liens, claims encumbrances and/or interests. The Bayshore Property will be maintained by Seller until the Closing in accordance with normal business and maintenance practices.

    **3.3.**   **Liens, Claims, Encumbrances, and Other Interests in the Bayshore Property.** Seller has made best efforts to identify to Buyer all liens, claims, encumbrances, and other interests in the Bayshore Property of which Seller has notice or actual knowledge; provided, however, that Seller has no obligation to obtain a title report or certified UCC search. The Bayshore Property shall be sold free of liens, claims and encumbrances, pursuant to Section 363(f) and (h) of the Bankruptcy Code.

    **3.4.**   **"AS IS" SALE.**  Other than the obligation of Seller to remove any third-party monetary liens on the Bayshore Property prior to Closing, BUYER ACKNOWLEDGES AND AGREES THAT, SELLER IS SELLING AND BUYER IS PURCHASING THE BAYSHORE PROPERTY ON AN "**AS IS WITH ALL FAULTS**" BASIS, AND BUYER HAS MADE OR HAS HAD AN OPPORTUNITY TO MAKE SUCH INDEPENDENT, FACTUAL, PHYSICAL,

3

AND LEGAL EXAMINATIONS, INQUIRIES, INSPECTIONS, TESTS AND STUDIES AS BUYER DEEMS NECESSARY OR DESIRABLE WITH RESPECT TO THE BAYSHORE PROPERTY AND BUYER WILL NOT AND IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM SELLER OR ANY CONSULTANTS AS TO ANY MATTERS CONCERNING THE BAYSHORE PROPERTY, INCLUDING, WITHOUT LIMITATION: (i) the quality, nature, adequacy and physical condition of the Bayshore Property, including square footage, drainage, soils, geology and/or any groundwater; (ii) the existence, quality, nature, adequacy and/or physical condition of utilities serving the Bayshore Property; (iii) any development approvals, development potential of, and/or the Bayshore Property's use, merchantability, or fitness, suitability, value or adequacy of the Bayshore Property for any particular purpose; (iv) title, zoning, or other legal status of the Bayshore Property, or any other public or private restrictions on use of the Bayshore Property, including without limitation, encroachments, easements and/or the existence of adverse claims; (v) the compliance of the Bayshore Property or its operation with any applicable codes, laws, regulations, statutes, ordinances, covenants, conditions and/or restrictions of any governmental or quasi-governmental entity, or of any other person or entity; (vi) the presence of Hazardous Materials (as defined below) on, under, or about the Bayshore Property, the adjoining property, or neighboring the Bayshore Property; (vii) the condition of title to the Bayshore Property; (viii) the economics of the operation of the Bayshore Property including, without limitation, any occupancy or use of the Bayshore Property by any party or entity; or (ix) the affect or availability of any governmental fee credits including, without limitation, any transportation, universal mitigation fees, or any other fees or credits available for the Bayshore Property. The terms of this Section 3.4 shall survive Closing or the earlier termination of this Agreement.

     **3.5.**   <u>**Buyer's Representations**</u>. Buyer hereby represents and warrants, both as of the date hereof and again as of the Closing, that this Agreement and all documents executed by Buyer which are to be delivered to Seller hereunder will be duly authorized, executed and delivered by Buyer, are, and as of the Closing will be, legal, valid and binding obligations of Buyer, and do not, and as of the Closing will not, violate any provisions of any agreement or judicial order to which Buyer is a party or to which it is subject.

     **3.6.**   <u>**Seller's Representations**</u>. Seller hereby represents and warrants, both as of the date hereof and again as of the Closing, that this Agreement and all documents executed by Seller which are to be delivered to Buyer hereunder will be duly authorized, executed and delivered by Seller, are, and as of the Closing will be, legal, valid and binding obligations of Seller, and do not, and as of the Closing will not, violate any provisions of any agreement or judicial order to which Seller is a party or to which it is subject.

**ARTICLE 4**
**ADDITIONAL COVENANTS**

     **4.1.**   <u>**Best Efforts to Obtain Consent of Lienholders**</u>. Without representation or warranty that it will be able to do so, Seller shall use its best efforts to obtain the consent to the sale contemplated hereby of any party asserting a lien, claim, encumbrance or other interest in the Bayshore Property.

4

**4.2.** <u>Removal of Third-Party Personal Property from the Bayshore Property</u>. Prior to Closing, Seller shall have used its best efforts to remove all personal property from the Bayshore Property, and any other equipment or other personal property which is not to be acquired by Buyer under this Agreement; provided, however, that Buyer may designate any such equipment or other personal property located at the Bayshore Property which may remain at the Bayshore Property pursuant to separate agreements between Buyer and third parties. Seller shall give Buyer at least five (5) business days' notice prior to removal of any equipment not to be acquired by Buyer, and Buyer shall have the right to be present during any such removal.

**4.3.** <u>Inspections</u>. Seller agrees that Seller shall allow Buyer and its representatives to make such inspection of the Bayshore Property and all documents, records and information with respect to the Bayshore Property in Seller's custody or control or to which Seller has access (the "**Records**") as Buyer deems appropriate, provided that Buyer shall provide 48 hours' notice to Seller of its intent to access the Bayshore Property or 24 hours' notice of intent to access the Records. Buyer may inspect the Bayshore Property and/or the Records at any reasonable time during normal business hours, Monday through Saturday, within 14 days from the Effective Date (the "**Inspection Period**"). If such inspection reveals any fact or condition unacceptable to Buyer (in the exercise of Buyer's sole and absolute discretion), Buyer may notify Seller and the escrow holder in writing prior to the expiration of the Inspection Period of such unacceptable fact or condition and Seller shall have the right (without any obligation to do so) to correct same prior to the end of the Inspection Period. If Seller (without any obligation to do so) does not correct such unacceptable fact or condition prior to the termination of the Inspection Period, or if such fact or condition is not capable of being corrected before the end of the Inspection Period, and Seller has not made a good faith effort to begin such correction, Buyer may terminate this Agreement. In the event that Buyer is not able to complete its inspection of the Bayshore Property prior to the termination of the Inspection Period, Buyer may request in writing that Seller (without any obligation to do so) extend the Inspection Period. Any such request to extend the Inspection Period must set forth the nature of the inspection to be conducted, the reason Buyer was not able to complete the inspection, and an estimate of the time needed to complete the inspection. In the event that, prior to the expiration of the Inspection Period, Buyer does not notify Seller and the escrow holder in writing that it disapproves the results of such inspection, Buyer shall be deemed to have approved the results of such inspection of the Bayshore Property. Buyer may at any time between the end of the Inspection Period and the Closing conduct a further inspection of the Records or the Bayshore Property upon the same notice requirements as referenced above.

**ARTICLE V**
**RELEASES**

**5.1.** <u>Release of Seller</u>.

(a) Except for matters included within Seller's representations and warranties expressly set forth in <u>Article 3</u>, Buyer, for itself and his or its agents, representatives, brokers, employees, attorneys, independent contractors, officers, directors, shareholders, partners, members, managers and their respective heirs, personal representatives, successors and assigns, and each of them, hereby waives, releases, acquits and forever discharges Seller and his respective partners, attorneys, officers, directors, employees, agents, representatives, brokers,

5

independent contractors, heirs, successors and assigns, and each of them, and their respective personal representatives, heirs, successors and assigns, and each of them (collectively, the "**Released Parties**"), of and from any and all claims, liabilities, demands, liens, penalties, costs and expenses, including, without limitation, attorneys' fees and costs, of any kind whatsoever, at law or in equity, known or unknown, which Buyer has ever had or may hereafter acquire or possess arising out of or in connection with, directly or indirectly, (a) any condition or characteristic of the Bayshore Property, or any part thereof, or any structure or improvements therein; (b) the environmental, zoning, safety, land use, and/or financial aspects of the Bayshore Property; (c) the nature, contamination, or environmental state of the Bayshore Property; (d) the existence, presence, or release of Hazardous Substances in, on, or under the Bayshore Property, and/or any other matter described in this Agreement; and/or (e) any other matter related to the Bayshore Property or Seller's ownership of an interest therein.

(b)     Buyer hereby waives the benefits of Section 1542 of the California Civil Code, which provides as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER, MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

(c)     Buyer expressly waives and relinquishes any and all rights and benefits under any state or federal statute and/or any common law which provides rights and benefits in any way similar to those provided under California Civil Code Section 1542.

(d)     **Definition of Hazardous Substances**.  For purposes of this Agreement, "**Hazardous Substances**" shall mean any hazardous or toxic substance, material or waste which is or becomes regulated by any local governmental authority, the State of California or the United States Government, including, without limitation any material substance which is: (1) defined as "hazardous waste," "extremely hazardous waste," or "restricted hazardous waste," under Sections 25115, 25117 or 25122.7, or as listed pursuant to Section 25140, of the California Health and Safety Code, Division 20, Chapter 6.5 including any amendments thereto; (2) defined as a "hazardous substance" under Section 25316 of the California Health and Safety Code, Division 20, Chapter 6.8 including any amendments thereto; (3) defined as "hazardous material," "hazardous substance," or "hazardous waste" under Section 25501, or as a "hazardous substance" under Section 25501.1, of the California Health and Safety Code, Division 20, Chapter 6.7 including any amendments thereto; (4) defined as "waste" under Section 13050 of the California Water Code; (5) any petroleum or petroleum products; (6) asbestos in any form; (7) any hydrocarbon substances; (8) PCBs; (9) transformers; (10) formaldehyde; (11) leakage from underground storage tanks; (12) listed under Article 9 of Title 22 of the California Administrative Code,  or defined as "hazardous," or "extremely hazardous" pursuant to Article 11 of Title 22 of the California Administrative Code, or Division 4, Chapter 20, including any amendments thereto; (13) listed as a "toxic pollutant" pursuant to Section 311 of the Federal Pollution Control Act (33 U.S.C. Section 1317) including amendments thereto; (14) defined as "hazardous waste," or "solid waste" pursuant to Section 1004 of the Federal Resource

6

Conservation and Recovery Act, (42 U.S.C. Section 6901 et seq., or 42 U.S.C. Section 6903), including any amendments thereto; or (15) defined as a "hazardous substance" pursuant to Section 101 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986 (42 U.S.C. Section 9601) including any amendments thereto; or in the regulations adopted, or judicial or administrative orders, decisions, or decrees promulgated, pursuant to any of the foregoing laws. The foregoing list of definitions and statutes is intended to be illustrative and not exhaustive, and such list shall be deemed to include all definitions and laws applicable to the subject matter contained herein.

(e)     Except for matters included within Seller's representations and warranties expressly set forth in Article 3, Buyer shall indemnify, protect, defend, and hold the Released Parties harmless from all claims, damages, losses, liabilities, costs and expenses, including attorneys' fees, for (i) any matters relating to the Bayshore Property arising out of acts or activities of Buyer or its agents, representatives and/or consultants on or about the Bayshore Property, including but not limited to bodily injury, and/or damage to the Bayshore Property; (ii) claims made by third parties against any of the Released Parties for amounts owed with respect to the Bayshore Property that arise from and/or after the Closing including, but not limited to, taxes, utility costs, maintenance costs, and/or vendor fees; and (iii) claims made with respect to matters from which the Released Parties are released pursuant to this Article V. This obligation shall survive Closing or any termination of this Agreement.

## ARTICLE VI
## CLOSING

**6.1.** **Conditions Precedent.** Seller shall have no obligation to sell the Bayshore Property to Buyer and Buyer shall have no obligation to purchase the Bayshore Property from Seller unless and until:

(i)     The other Party shall have delivered all items to be delivered by it pursuant to Section 6.2 and Section 6.3 below and shall have complied with each and every condition of this Agreement applicable to it;

(ii)     The Approval Order shall have been entered, approving this Agreement and conveyance of Bayshore Property to Buyer upon payment of the Purchase Price or such Overbid Price approved by the Court, and all conditions precedent to Closing have been satisfied; and

(iii) All provisions of Section 8.2, et seq., have been complied with.

**6.2.** **Delivery by Seller.** At least three (3) business days prior to Closing Seller shall deposit with Title Company the following:

(a)     The Grant Deed in the form of Exhibit 1 attached hereto duly executed and acknowledged in recordable form; and

7

(b)     Such other instruments as are reasonably requested by the other Party or otherwise required to close Escrow and consummate the purchase of the Bayshore Property in accordance with the terms hereof.

### 6.3.     Delivery by Buyer.

(a)     Within five (5) business days after the date of this Agreement, Buyer shall deposit with Title Company any documents or instruments as are reasonably requested by the other Party or otherwise required to close the Escrow and consummate the purchase of Bayshore Property in accordance with the terms hereof.

(b)     Within five (5) business days after notification of amounts due, Buyer shall deliver to Title Company the amount of recording costs, transfer taxes and other charges owed by Buyer pursuant to Section 6.4 below. If any such amounts cannot be determined prior to Closing, then Buyer shall pay such amounts to Trustee within five (5) business days after receipt of an invoice for such amounts after Closing.  It is expressly understood that Buyer shall be responsible for all closing costs, recording fees, transfer taxes and any other cost or fee related to the transfer of the Bayshore Property to Buyer as contemplated by this Agreement from any source.

### 6.4.     Prorations and Apportionments.

(a)     From and after Closing, Buyer shall be solely responsible for liabilities and expenses related to the Bayshore Property and which arise from or after the Closing Date, including but not limited to taxes, utility costs, maintenance costs, vendor fees, and tenant security deposits. In connection therewith, Buyer expressly acknowledges and agrees that Buyer has been informed that Seller does not have custody of any pre-paid rent and/or security deposits from any source relating to the occupancy or operations of the Bayshore Property (including, without limitation tenant security deposits) (collectively, the "**Security Deposits**") and Buyer shall be given **NO** credit for any Deposits at Closing related to any space, commercial or residential that was leased prior to the Seller's appointment as Trustee. Seller will however, provide a credit for any monies held, including security deposits or pre-paid rents which are actually held by Seller, including without limitation such Security Deposits received by Seller from and after the date of his appointment as Trustee. Seller shall not be obligated for repayment of any Security Deposits to any parties entitled thereto unless Seller was in possession of such Security Deposits during the course of his appointment as Trustee. In connection therewith, the agreement for Buyer to be solely responsible for the payment of the Deposits to the parties entitled thereto, if any, is a material inducement for Seller entering into this Agreement and shall survive Closing.

(b)     Prepaid, fixed and additional rents, if any in connection with any leases shall be prorated as of the Closing. As long as Seller is provided proration credit for such rents which are due and payable to Seller prior to Closing such rents that are uncollected as of the Closing shall become payable to Buyer.

8

(c)    **Taxes.** All real estate taxes against or in respect of the Bayshore Property for the taxable period prior to the Closing Date shall be prorated between Seller and Buyer as of the day prior to the Closing Date. In the event the amount of such taxes and assessments cannot be ascertained as of the Closing Date, proration shall be made on the basis of the preceding year and to the extent that such proration may be inaccurate, each Party shall make such payment to the other after the tax statements have been received as may be necessary to allocate such taxes properly between Seller and Buyer as of the day prior to the Closing Date.

**ARTICLE VII**
**DEFAULT AND TERMINATION**

**7.1.    Default By Seller.**  In the event that (1) Seller fails to perform any of its obligations on or before the Outside Closing Date or is otherwise in default hereunder, or (2) the Approval Order has not been lodged with the Court for entry within fifteen (15) days of the Overbid Auction and Hearing on Sale Motion, Buyer shall have the right to give notice to Seller and Title Company, specifically setting forth the nature of such failure and stating that Seller shall have a period of ten (10) days to cure such failure.  If Seller has not cured such failure within such period (or, if such failure is not capable of being cured within ten (10) days, Seller either has not commenced in good faith the curing of such failure within such period or does not diligently thereafter complete such cure prior to the Closing Date), Buyer shall have the right to exercise one of the following mutually exclusive remedies:

(a)    Waive such failure and proceed to the Closing with no reduction in the Purchase Price.

(b)    Terminate this Agreement in writing by notice to Seller to that effect.

(c)    File an action in the United States Bankruptcy Court for the Northern District of California to enforce specific performance. Except for matters included within Seller's representations and warranties expressly set forth in Article 3 hereto , in no event shall the Released Parties be liable for damages.

(d)    Except for matters included within Seller's representations and warranties expressly set forth in Article 3, effective as of the Closing, Buyer and anyone claiming by, through or under Buyer hereby waives its right to recover from and fully and irrevocably releases the Released Parties from any and all claims that it may now have or hereafter acquire against any of the Released Parties for any costs, loss, liability, damage, expenses, demand, action or cause of action arising from or related to any matter affecting the Bayshore Property, or any portion thereof.

(e)    Except for matters included within Seller's representations and warranties expressly set forth in Article 3, effective as of the Closing, this release includes claims of which Buyer is presently unaware or which Buyer does not presently suspect to exist which, if known by Buyer, would materially affect Buyer's release of the Released Parties.  To the extent permitted by law, except for the limitations contained in the preceding sentence, Buyer hereby agrees, represents and warrants, which representation and warranty shall survive the closing, that

9

Buyer realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are presently unknown and unsuspected, and Buyer further agrees, represents and warrants, which representation and warranty shall survive the closing, that the waivers and releases herein have been negotiated and agreed upon in light of that realization and that Buyer nevertheless hereby intends to release, discharge and acquit the Released Parties from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which might in any way be included as a material portion of the consideration given to Seller by Buyer in exchange for Seller's performance hereunder. The foregoing release shall not apply to any of the matters expressly contained in this contract.

Seller has given Buyer material concessions regarding this transaction in exchange for Buyer agreeing to the provisions of this Paragraph. Seller and Buyer have each initialed this Paragraph to further indicate their awareness and acceptance of each and every provision hereof.



Buyer's Initials



Seller's Initials

    **7.2.**   **Default By Buyer.** In the event Buyer fails to perform any of its obligations or is otherwise in default hereunder on or before the Outside Closing Date, Seller shall have the right to give notice to Buyer and Title Company specifically setting forth the nature of such failure and stating that Buyer shall have either (i) a period of three (3) business days to cure any failure to either pay money or perform by a date certain; or (ii) a period of ten (10) days to cure any other failure. If Buyer has not cured such failure within the applicable period (or, if any such failure under (ii) above is not capable of being cured within ten (10) days, Buyer either has not commenced in good faith the curing of such failure within such period or does not diligently thereafter complete such cure prior to the Closing Date), Seller shall have the right to exercise one of the following mutually exclusive remedies:

        (a)   Waive such failure and proceed to the Closing.

        (b)   Terminate this Agreement in writing by giving notice to Buyer to that effect.

        (c)   File an action in the United States Bankruptcy Court for the Northern District of California to enforce any remedy available to Seller with respect to such breach hereunder, at law or in equity.

    **7.3.**   **Liquidated Damages.** THE PARTIES HAVE DETERMINED AND AGREED THAT THE ACTUAL AMOUNT OF DAMAGES THAT WOULD BE SUFFERED BY SELLER AS A RESULT OF BUYER'S DEFAULT THAT RESULTS IN A FAILURE TO CLOSE UNDER THIS AGREEMENT IS DIFFICULT OR IMPRACTICAL TO DETERMINE AS OF THE EFFECTIVE DATE OF THIS AGREEMENT AND THAT IN SUCH EVENT THE AMOUNT OF THE DEPOSIT IN ESCROW AT THE TIME OF THE DEFAULT,

10

EXCLUSIVE OF ANY INTEREST ACCRUED THEREON, SHALL BE DELIVERED OR CAUSED TO BE DELIVERED BY BUYER TO SELLER AS LIQUIDATED DAMAGES, WHICH LIQUIDATED DAMAGES SHALL CONSTITUTE SELLER'S SOLE AND EXCLUSIVE REMEDY (WHETHER AT LAW OR IN EQUITY, INCLUDING ANY REMEDY FOR SPECIFIC PERFORMANCE) AGAINST BUYER ON ACCOUNT OF BUYER'S DEFAULT THAT RESULTS IN A FAILURE TO CLOSE UNDER THIS AGREEMENT AND SELLER SHALL BE RELEASED FROM ITS OBLIGATION TO CONVEY THE BAYSHORE PROPERTY TO BUYER. SELLER HEREWITH WAIVES ALL OTHER CLAIMS OR CAUSES OF ACTION AGAINST BUYER OR BUYER'S AGENTS AND EMPLOYEES, INCLUDING ANY CLAIMS ARISING BY STATUTE OR COMMON LAW, WHETHER SUCH CLAIMS BE CHARACTERIZED AS CONTRACT OR TORT CLAIMS.

Buyer's Initials            Seller's Initials

**7.4.** **Effect Of Termination.** Upon the termination of this Agreement for any reason, neither Buyer nor Seller shall have any further obligations hereunder, except those which explicitly survive termination of this agreement as set forth herein.

## ARTICLE VIII
## MISCELLANEOUS

**8.1.** **Notices.** Any notice, request, demand, consent, approval or other communication required, provided or permitted under this Agreement shall be in writing, signed by the Party giving such notice, and shall be deemed to have been given: (a) upon hand delivery; (b) one (1) business day after being deposited with Fed Ex or another reliable overnight courier service; (c) upon receipt if transmitted by facsimile or e-mail, provided that an additional notice is sent pursuant to clause (a), (b) or (d) herein, or (d) three (3) days after being deposited in the United States mail, registered or certified mail, postage prepaid, return receipt required, and addressed as follows:

If to Seller:        Peter Kravitz
Chapter 11 Trustee
29209 Canwood Street, Suite 210
Agoura Hills, CA 91301
Facsimile: (310) 974-6342
E-mail: pkravitz@solutiontrust.com

With a copy to:     Ezra Brutzkus Gubner LLP
21650 Oxnard St., Suite 500
Woodland Hills, CA 91367
Attention: Glenn Fuller, Esq.

11

```
                              Facsimile: (818) 827-9099
                              E-mail: gfuller@ebg-law.com

        If to Buyer:          RTC-Equity, LLC
                              1 Sansome Suite 1500
                              San Francisco, CA 94104
                              Facsimile: (415) 889-6950
                              E-mail: solomon@redtowercapital.com

        With a copy to:       French & Lyon
                              One Sansome Street, 7th Floor
                              San Francisco, CA 94104
                              Attention: Patricia H. Lyon, Esq.
                              Facsimile: (415) 243-8200
                              E-mail: phlyon@frenchandlyon.com

        If to Title Company:  Lawyers Title Company
                              Commonwealth Land Title Insurance Company
                              888 South Figueroa, Suite 2100
                              Los Angeles, California. 90017
                              Email: ssoudani@ltic.com
```

or such other address as either Party may from time to time specify in writing to the other in accordance with this <u>Section 8.1</u>.

     **8.2.**   <u>**Court Approval.**</u> Promptly upon full execution of this Agreement, Seller shall apply to the Bankruptcy Court pursuant to 11 U.S.C. §363 for an amended Sales Procedure Order (the "**Amended Sales Procedure Order**"), in a form reasonably acceptable to Buyer, providing for substantially the same procedures as set forth in the September 12, 2013 Sales Procedure Order modified to provide for the current Purchase Price and other amended terms set forth herein. Thereafter, Seller shall file a motion (the "**Sale Motion**") in the Bankruptcy Court seeking an order approving this Agreement and the sale contemplated hereby free and clear of any lien, claim, encumbrance, or interest (the "**Sale Order**"). The sale will be subject to the Court granting the Sale Motion and ultimately entering the Approval Order. Both Buyer's and Seller's obligations to consummate the transactions contemplated in this Agreement shall be conditioned upon the Court's entry of the Approval Order and upon Buyer's being the successful bidder at the Overbid Auction. This Agreement shall remain in full force and effect except to the extent modified by the Approval Order or any further Order of the Court regarding the Bayshore Property. Buyer shall provide all information reasonably required by Trustee to demonstrate that Buyer can provide adequate assurance of future performance under any contracts to be assumed by Buyer pursuant to this Agreement, and Buyer shall be solely responsible for providing such adequate assurance.

     The Sale Motion, or such other additional motion as may be required, shall also request entry of a preliminary order approving the bidding procedures set out in <u>Section 8.3</u> below (the "**Sale Procedures Order**"). The sale of the Bayshore Property shall be subject to higher and

12

better bids, as determined by the Trustee in the exercise of his reasonable business judgment and approved by the Court in accordance with the Sales Procedures Order. The notice of the hearing to consider the Sale Motion (the "**Hearing**"), the Amended Sale Procedures Order and the Sale Motion shall be served on all parties required by the Bankruptcy Code and any other person, party, or entity identified by Buyer (the "**Notice**"). At the Hearing, Seller shall offer testimony (whether live, documentary, or by proffer) to establish that the transactions proposed herein are fair and equitable, entered into in good faith by both Parties, are in the best interests of the creditors and the Estate, and that the sale is a valid and proper exercise of the Sellers' business judgment, and such other evidence as Buyer reasonably believes is necessary to obtain approval of the Sale Motion and entry of the Approval Order. If the Court refuses to issue the Approval Order at the Hearing on the Sale Motion or if an overbid to purchase the Bayshore Property for more than the Purchase Price is approved by the Court at the Overbid Auction and Hearing to Approve Sale, then this transaction shall automatically terminate and Seller and Buyer shall be relieved of any further liability or obligation hereunder; provided, however that Seller shall be required to instruct Title Company to deliver the Deposit to Buyer together with any and all interest accrued thereon within the time period set forth in section 2.2 above.

8.3    **Bidding Procedures; Reimbursement of Buyer's Expenses**.  The Amended Sales Procedures Order shall contain at least the following terms:  In the event that other parties submit competing bids, ("**Overbids**") for the Bayshore Property, at least five (5) business days prior to the Hearing, such parties shall make an earnest money deposit of at least $100,000, and such parties shall provide evidence satisfactory to the Trustee that such parties have the financial ability to complete the sale. The Trustee shall retain sole discretion to determine whether any potential bidder is deemed a "**Qualified Bidder**," and only Qualified Bidders may participate at the Auction for the Bayshore Property, to be conducted in accordance with the Sale Procedures Order, ("**Overbid Auction**").  Buyer may, but is not required to submit further bids in the event Overbids are made. Any initial Overbid must be by at least $100,000 – in other words, any party wishing to be determined to be a Qualified Bidder must submit an initial bid of not less than $2,850,000. Any further Overbids prior to or at auction must be in increments of not less than $25,000. In the event that another bidder makes a higher bid than Buyer and such offer is determined by the Trustee and approved by the Bankruptcy Court to be the highest and best offer, then, subject to application by Buyer and Bankruptcy Court approval, $50,000 of such additional Overbid amount shall be paid to Buyer by Sellers out of the proceeds of sale of the Bayshore Property as reimbursement for Buyer's actual costs and expenses (including, without limitation, reasonable attorneys' fees) in performing due diligence, preparing and entering into this Agreement, and preparing other documents and taking other actions incident thereto, ("**Break-up Fee**").  The Sales Procedures Order shall approve the obligations in this paragraph, which shall thereafter be binding on Buyer and Seller, but subject to Court approval.

8.4.    **Brokers and Finders.**

(a)    Buyer hereby represents and warrants that it has agreed to pay Eddie Salem Prudential Cal Realty, DRE License No. 01407972 ("**Buyer's Broker**"), a commission in connection with the acquisition of the Bayshore Property. Other than Buyer's Broker, Buyer hereby represents and warrants that it has not agreed to pay any fee, finder's fee, commission or other similar compensation in connection herewith and it has not acted through any broker or

13

finder who could claim any such other or additional compensation. Buyer further agrees to indemnify and hold Seller harmless from and against all damages, liabilities, costs, expenses and losses (including, without limitation, reasonable attorneys' fees and costs) which Seller may sustain or incur by reason of any claim for any such fee or compensation including any claims by Buyer's Broker.

(b) Seller hereby represents and warrants that it has agreed to pay no broker's fee, finder's fee, commission or other similar compensation in connection with the sale of the Bayshore Property to Buyer for the Purchase Price, and it has not acted through any broker or finder who could claim any such other or additional compensation related thereto. Seller further agrees to indemnify and hold Buyer harmless from and against all damages, liabilities, costs, expenses and losses (including, without limitation, reasonable attorney's fees and costs) which Buyer may sustain or incur by reason of any claim for any such fee or compensation, other than claims based upon dealings solely with Buyer.

8.5. **Successors and Assigns.** This Agreement shall be binding upon, and inure to the benefit of, the Parties hereto and their respective successors, and assigns.

8.6. **Further Acts.** Each Party shall, at the request of the other, execute, acknowledge (if appropriate) and deliver such additional documents, and do such other acts, as may be reasonably required in order to accomplish the intent and purposes of this Agreement.

8.7. **Merger Of Prior Agreements; Amendments.** This Agreement and the Exhibits hereto constitute the full and complete agreement and understanding, and supersede all prior and contemporaneous agreements and understandings, between the Parties hereto relating to the subject matter hereof. Without limiting the foregoing, the Parties acknowledge and agree that upon full execution of the Agreement, all prior offers, counter offers and correspondence regarding the Bayshore Property among the Parties or their predecessors or agents are null and void and of no force or effect. This Agreement may be amended or modified only by a written instrument executed by the Party asserted to be bound thereby.

8.8. **Attorneys' Fees.** In the event either Buyer or Seller brings any suit or other proceeding with respect to the subject matter or to enforce any provision of this Agreement, the prevailing party (as determined by the court, agency or other authority which adjudicates such suit or proceeding) shall, in addition to such other relief as may be awarded, be entitled to recover attorneys' fees, expenses and costs of investigation as actually incurred (including, without limitation, attorneys' fees, expenses and costs of investigation incurred in appellate proceedings, in establishing the right to indemnification or in any action or participation in, or in connection with, any state or federal bankruptcy or debtor relief case or proceeding).

8.9. **Authority Of Individuals.** Each individual executing this Agreement on behalf of Buyer or Seller hereby represents and warrants that (a) such individual has full power and authority to execute this Agreement on behalf of its Party; and (b) the execution and delivery of this Agreement have been duly authorized by such Party and such execution is binding thereon.

14

**8.10.** **Validity.** In the event any provision of this Agreement, or the application thereof in a particular context, is held unenforceable, invalid or in violation of law by any court or quasi-judicial body of competent jurisdiction, then the application of such provision in other contexts shall not be affected thereby and, in all events, the remaining provisions hereof shall remain in full force and effect.

**8.11.** **No Waiver.** No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof, nor shall any waiver constitute a continuing waiver. Except as otherwise provided in this Agreement, no waiver shall be binding unless executed in writing by the Party making the waiver.

**8.12.** **Possession.** Possession of the Bayshore Property shall be delivered to Buyer upon Closing. All risk of loss or damage to the Bayshore Property shall pass to Buyer upon the earlier to occur of the Closing or Buyer's taking possession of the Bayshore Property.

**8.13.** **Termination of Covenants, Representations, and Warranties.** The covenants, representations, and warranties made by Seller and/or Buyer herein shall not terminate as of the Closing. Buyer and Seller shall each have the right to seek indemnification subsequent to the Closing based on a breach of a representation, warranty or any covenant made by Seller or Buyer herein or in any other document, certificate or instrument entered into by Seller or Buyer in connection herewith; provided that Seller shall not be personally liable to Buyer hereunder except in the case of Seller's fraud. Neither Seller, nor any officer, director, employee, broker, agent, or attorney of Seller, nor any such person's property or estate shall be personally liable with respect to any obligation or liability of Seller under this Agreement.

**8.14.** **Interpretation.** Words in the singular shall be deemed to include the plural and vice versa and words in a particular gender shall be deemed to include each other gender. The captions and headings of the Articles and Sections of this Agreement are for convenience of reference only and shall not be deemed to define or limit the provisions hereof. Time shall be of the essence of every provision of this Agreement.

**8.15.** **Governing Law; Venue.** This Agreement shall be governed by and construed in accordance with the internal laws, without regard to the conflicts of law provisions of such laws, of the State of California applicable to agreements made and to be performed in such state. The Parties irrevocably agree that all actions or proceedings relating to this Agreement shall take place in the United States Bankruptcy Court for the Northern District of California, and the Parties waive any objections that they may have based on improper venue or forum non conveniens.

**8.16.** **Counterparts; Court's Approval.** This Agreement may be executed in one or more counterparts by the Parties hereto. All counterparts shall be construed together and shall constitute one agreement. This Agreement shall be of no force or effect unless and until a copy hereof is executed by both Buyer and Seller and approved by the Court. Telefax and electronic (pdf) signatures shall be effective as originals.

**8.17.** **Time.** Time is of the essence of this Agreement.

15

8.18   **Insurance**.   Seller shall maintain general liability insurance in the minimum amount of $1,000,000 and casualty insurance in the minimum amount of the Purchase Price in force against the Bayshore Property through the earlier of the Closing or the Outside Closing Date.

8.19   **Risk of Loss**.   In the event of any damage to the Bayshore Property prior to the Closing in excess of One Hundred Thousand Dollars ($100,000) Buyer shall not be obligated to purchase the Bayshore Property; provided, however, that in the event of any loss less than One Hundred Thousand Dollars ($100,000) the Buyer shall still be obligated to purchase the Bayshore Property. In such an event, Seller shall assign any insurance proceeds to Buyer.

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement as of the Effective Date first set forth above.

SELLER:

PETER KRAVITZ, Trustee
for The Zuercher Trust of 1999

BUYER:

RTC-Equity LLC
a California limited liability company

By: _____
    Ken Wei, Manager

By: _____
    Daniel Rabb, Manager

By: _____
    Solomon Gorlick, Manager

16

<u>**EXHIBIT 1**</u>

<u>**FORM OF GRANT DEED**</u>

**RECORDING REQUESTED BY**

When Recorded Mail To:

Ezra Brutzkus Gubner LLP
Attn: Glenn Fuller, Esq.
21650 Oxnard St., Suite 500
Woodland Hills, CA 91367

APN: 080-102-07-100                 (space above for recorder's use only)

**GRANT DEED**

The undersigned Grantor(s) Declare(s)

DOCUMENTARY TRANSFER TAX is $_____
Assessor's Parcel No. _____
_____ unincorporated area _____ City of _____
_____ computed on full value of property conveyed, or
_____ computed on full value less value of liens or
encumbrances remaining at time of sale, and

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

**The Zuercher Trust of 1999**

hereby REMISES, RELEASES AND FOREVER GRANTS to

**RTC-Equity LLC, a California limited liability company**

the following described real property in the unincorporated area of the County of San Francisco,
State of California, described as follows:

See <u>Exhibit A</u> attached

Dated: March ____, 2014                 _____

PETER KRAVITZ, Trustee

17

Exhibit A

Legal Description